IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | |
|---|---|
| S1, Inc., | § |
| Plaintiff, | § § § CIVIL FILE |
| v. | § ACTION NO. **A08CA0026LY** |
| Q2 SOFTWARE, INC., CARDINAL SOFTWARE, INC., and S.E. YARBOROUGH, | § § § § |
| Defendants. | § § |

## COMPLAINT

S1, Inc. ("S1") hereby files its Complaint against Defendants Q2 Software, Inc. ("Q2"), Cardinal Software, Inc. ("Cardinal"), and S.E. Yarborough (collectively "Defendants"), and in support thereof would respectfully show the Court as follows:

### INTRODUCTION

1. S1 brings this action to remedy Defendants' unfair competition through a systematic, willful and malicious misappropriation and infringement of S1's proprietary information and intellectual property. Such conduct follows S1's acquisition of a company that formerly employed several employees of Q2 and Cardinal. Specifically, in April 2000, S1's parent corporation, S1 Corporation, acquired a company known as Q-UP, Inc. ("Q-UP"), which acquisition resulted in significant financial benefit to Q-UP's shareholders, including its founder Robert "Hank" Seale, III ("Seale"), who is also the founder and Chief Executive Officer ("CEO") of Q2 and the Chairman of Cardinal. Q-UP was thereafter merged into S1. Following Seale's departure from S1 Corporation, he set up Q2 in competition with S1 and quickly started raiding S1's employees on behalf of Q2 and Cardinal. In doing so, Q2 and Cardinal also raided

1833163 v02

S1 of its proprietary information and intellectual property in violation of copyright law, written agreements and other legal obligations. Using S1's proprietary information and intellectual property, Q2 and Cardinal have also interfered with S1's contractual relations and prospective business relations in an effort to cause S1's customers and potential customers to terminate their contractual and business relationships with S1 and to utilize the products and services of Q2 and Cardinal, which includes S1 products being passed off as owned by Q2 or Cardinal. S1 seeks permanent injunctive relief and damages to redress the injuries to its right to face fair competition in the marketplace.

## PARTIES

2.  S1 is a Kentucky corporation registered and authorized to conduct business in the State of Texas with its principal office and place of business located in Norcross, Georgia.

3.  Defendant Q2 is a Delaware corporation with its principal place of business located at 9430 Research Blvd., Building IV, Suite 400, Austin, Travis County, Texas 78759. Q2 may be served with process through its registered agent for service of process, Robert H. Seale, III, 6000 West Highway 290, Dripping Springs, Texas 78620, or The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

4.  Defendant Cardinal is a Delaware corporation with its principal place of business located in Tennessee. Cardinal also conducts business at 9430 Research Blvd., Building IV, Suite 400, Austin, Travis County, Texas 78759. Cardinal may be served with process through its registered agent for service of process, Jace Day, 8834 North Capital of Texas Highway, Suite 210, Austin, Texas 78759, or The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

5.  Defendant S.E. Yarborough ("Yarborough") is an individual who was a resident of Travis County, State of Texas during the time periods relevant to this action. Yarborough

maintains a residence in the State of Texas and may be served with process at his last known address, 6724 Marble Creek Loop, Austin, Texas 78747.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338, and 1367(a). This is an action for copyright infringement and federal unfair competition under the Lanham Act, as well as claims for breach of contract, tortious interference, and common law unfair competition/passing off.

7. As residents of, or due to maintaining an office and doing business in, the State of Texas within the boundaries of the Austin Division of the Western District of Texas, Defendants are subject to personal jurisdiction in this Court.

8. Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### S1'S ACQUISITION OF Q-UP

9. S1 provides software solutions to banks, credit unions and insurance providers. Among the many services that S1 provides to its customers is a comprehensive set of software applications that allow financial institutions to provide Internet and voice/telephone banking services for their account holders.

10. In an effort to expand its business offerings and compete more effectively, in April of 2000, S1's parent company, S1 Corporation, purchased Q-UP, an established company that offered Internet and telephone banking services to community financial institutions. S1 Corporation's purchase of Q-UP was designed to increase its competitive position in the community financial institution market and allow it to more efficiently and effectively market products and services to community financial institutions.

11. Internet and telephone banking has become, and continues to become, widely-used methods of personal and business banking.

12. In 2003, Q-UP was combined, re-branded and merged into S1, becoming part of the Community and Regional division of S1, rather than a separate, stand-alone business. Because of the name and brand recognition of Q-UP, however, many customers and potential customers still refer to S1's community financial institution division as Q-UP.

13. As a result of the acquisition, S1 is the successor-in-interest to Q-UP's business, intellectual property rights, and agreements. References to "S1" herein thus include Q-UP's rights and information.

### Q-UP/S1 EMPLOYEE CONFIDENTIALITY OBLIGATIONS ·

14. S1 employees, including the Q-UP employees who became S1 employees as a result of the acquisition of Q-UP, were required to sign confidentiality policies under which each employee agreed to maintain the confidentiality of S1 proprietary information even after the cessation of employment with S1. The confidentiality policies were either directly with Q-UP, with Q-UP as an S1 Corporation company, or with S1.

15. Yarborough, who became an S1 employee in September 2004, signed a Confidentiality Acknowledgement and Disclaimer on September 21, 2004, which included the following language:

> As an employee of S1, you further acknowledge your responsibility and the necessity to safeguard all confidential and sensitive business information. As an S1 employee you agree that during the course of your employment, and for so long thereafter as such information remains sensitive, you will not use or disclose, or furnish, or make accessible to anyone any such confidential information to the extent that such information is material to S1 or any client's business or well being and not generally known to the public.
>
> As an employee of S1, you understand the legal implications and subsequent consequences of software piracy and that any violations,

> intentional or otherwise, are subject to United States copyright laws, international treaty provisions, and any other applicable national laws. You further acknowledge that company provided computer resources are for business and professional use only and not for personal gain.
>
> As an employee of S1 you agree that, upon termination of your employment, whether voluntary or involuntary, you will return to S1 all work papers pertaining to the business of S1 or its clients, including without limitations, files, computer programs, documents, drawings, studies, proposals and customers lists in whatever forms.

16. Given their past employment with S1, approximately 30 former S1 employees later employed by Q2 and/or Cardinal ("Former S1 Employees") are not only bound by confidentiality policy statements, but they are aware that all S1 employees sign confidentiality policy statements.

17. The Former S1 Employees had access to an extensive range of S1 confidential and proprietary information, including but not limited to business plans, product information, software, software documentation, customer lists, pricing information and other S1 confidential business information.

18. Notably, some of the Former S1 Employees held significant officer and management positions with S1, and were thus in a position to learn and access significant S1 proprietary information. For example, Seale served as CEO of Community and Regional Solutions.

### SEALE LEAVES S1; FORMS Q2 TO COMPETE AGAINST S1

19. In the fall of 2004, Seale started Q2 for purposes of engaging in direct competition with S1 by offering competing products and services to community financial institutions. Specifically, Q2 was formed to develop and license Internet and telephone banking solutions in direct competition with S1.

1833163 v02

## THE RELATIONSHIP BETWEEN CARDINAL AND Q2

20. Seale and/or Q2 are presently related to Cardinal, which is the developer and licensor of a core banking data processing software application known as Cardinal/400. The Cardinal/400 application runs on an IBM AS/400 platform.

21. Q2 and Cardinal share office space in Austin, Texas. As noted herein, Seale is the CEO of Q2 and the Chairman of Cardinal and, upon information and belief, is directly or indirectly a significant shareholder of both companies.

22. Q2 and Cardinal serve the interests of each other, and complement each-others' business. For example, Cardinal states on its website that its "preferred system provider for Internet and Voice Banking solutions is Q2 Software, Inc." Additionally, Cardinal is the developer of software used by Q2 in competition with S1.

## Q2 AND CARDINAL RAID S1 EMPLOYEES

23. After creating Q2, Seale or his companies began a pattern of systematic recruiting of key S1 personnel to leave their employment with S1 and become employees of Q2 and Cardinal.

24. S1 employees recruited to join Q2 and Cardinal include the Former S1 Employees.

25. Seale, Q2 and Cardinal, and others on their behalf, acted in concert to identify key S1 employees and former employees for recruitment to Q2 and Cardinal. Upon information and belief, the Former S1 Employees recruited on behalf of Q2 and Cardinal were selected because they possessed extensive amounts of proprietary S1 information and intellectual property that could be utilized by Q2 and Cardinal in competition with S1.

26. Yarborough resigned from S1 effective February 27, 2006, and ultimately joined Cardinal.

## Q2'S METHODS OF COMPETITION

27. Starting in 2005 and continuing through the present, Q2 has engaged in questionable competitive activities, leading S1 to become concerned about Q2's potential retention and use of S1 proprietary information. Such competitive activities included the specific targeting of S1 customers for conversion to Q2 and the conversion of S1 customers from S1 software to Q2 software without the technical assistance of S1, implying that Q2 possesses S1 proprietary information. One S1 customer has commented that they were contacted by Q2 and believed that Q2 possessed S1's information. S1's suspicions, however, were not confirmed until recently.

## YARBOROUGH'S USE OF S1 COPYRIGHTED INFORMATION ON BEHALF OF CARDINAL AND Q2

28. S1's fears of unfair competition and use of its intellectual property were confirmed in September 2007 when, as discussed below, Yarborough sent S1 software interface documentation for Cardinal and Q2 that is an obvious derivative of S1 interface documentation. In simple terms, an interface is software that allows different modules of software to communicate with each other. For example, an interface can allow a software program to communicate and process data stored within a database. Interfaces are also what allow banking systems, such as Internet and voice/telephone banking software, to communicate with core banking software. On information and belief, based on the employee raiding, targeting of S1 customers, the conversion of S1 customers from S1 software to Q2 software without the technical assistance of S1, comments from customers, and now the use of S1's interface documentation, the known Q2 and Cardinal conduct is merely the tip of the iceberg.

29. While employed by S1, Yarborough had significant responsibility for developing various interfaces for S1. In fact, Yarborough's 2004 S1 performance appraisal contains the following statement:

> SE [Yarborough] has taken command and ownership of a product that has little product management oversight. The AS400 interfaces are vital to a large number of EP and C&R customers. Without this product and SE's ownership, we would likely lose 500 or more customers (at least).

30. The purpose of the interfaces developed by Yarborough was to allow what is known as "realtime" data processing in addition to batch processing. Realtime processing is a method under which data is processed as it is entered into a system. This ensures that a customer's information is up to date and accurate with each entry or modification of data.

31. Not all banking software utilizes realtime data processing, but instead uses what is known as "batch" data processing. Under this less efficient method of processing, data entry and/or edits may be compiled over a period and processed at one time, *i.e.*, overnight.

32. S1's realtime data processing gave it a competitive advantage over vendors who utilized batch processing.

33. One series of S1 interfaces is known as the ISERIES/DEU/K400 Host Systems Interface ("S1 K400 Host Interface"), which provides S1 with a competitive advantage in the community banking market as it provides a cost effective realtime interface into four different core banking software systems (JH Silverlake, JH 20/20, CBS Fiserv and Fidelity Horizon), thus giving S1 customers an option to choose between such core banking systems' interfaces or the S1 K400 Host Interface. A core banking system is essentially the central deposit computer system used by a bank. The S1 K400 Host Interface is a solution that lowers costs and offers an alternative method to retrieve realtime and batch information from the select core systems.

34. One specific S1 interface for the S1 K400 Host Interface that was developed by Yarborough while employed by S1 is the "K400/DEU/SOCKET" ("S1 K400 Socket").

35. With regard to the S1 K400 Socket, Yarborough not only worked on developing the S1 K400 Socket software, but he also drafted related documentation including a document entitled "K400/DEU/Socket" ("S1 K400 Socket Document") and a document entitled "S1 K400/Deureal Server API Technical Specifications" ("S1 K400 API Document"). Yarborough identified the S1 K400 Socket Document as "S1 Internal – Not for use outside S1 Corporation except by written agreement" and the S1 K400 API Document as "Confidential." The S1 K400 Socket software, S1 K400 Socket Document and the S1 K400 API Document were registered with the United States Copyright Office on December 14, 2007, registration numbers TXu 1-570-163, TXu 1-570-174 and TXu 1-570-165, respectively.

36. In September 2007, S1 was working on a project involving a common customer of S1 and Cardinal to provide realtime processing. For purposes of serving the common customer, S1 was communicating with Yarborough, then employed by Cardinal.

37. As part of this customer service project, Yarborough sent to S1 a document entitled "Cardinal Socket Server API Technical Specifications" ("Cardinal API"). The author of the Cardinal API document was Yarborough. This Cardinal API document is virtually identical to, and an obvious derivative of, the S1 K400 API Document, drafted by Yarborough while employed at S1.

38. The "development analysis" section in the S1 K400 API Document states that it was "written for the S1 K400/DEUREAL API Server." The "development analysis" section in the Cardinal API documentation states that it was "written for the Q2 REALTIME API Server." This is an untrue statement because the API subject to the document was developed for S1. It

also says that "The Q2 interface services the Cardinal core software packages." Yarborough violated his Confidentiality Acknowledgment and Disclaimer by taking this document to Cardinal for use by Cardinal and Q2.

39. The S1 K400 API Document also states that "the K400 interface services the Jack Henry 20/20, Jack Henry Silverlake, Fiserv CBS, and Alltel Horizon core software packages." Since Yarborough took the interface documentation, it is also likely he also took the interface software. Thus, on information and belief, by copying S1's interface, Q2 has also gained the ability to interface with these other software packages in direct competition with S1. Even if Q2, Cardinal or Yarborough do not have the software, however, the interface documentation could be used as a guide to more quickly develop the interface software and use it to compete against S1.

40. Another document Yarborough sent to S1 was a document entitled "Cardinal_Socket Plug_In for Q2_REALTIME Processing" ("Cardinal Socket"). Again, Yarborough is identified as the author. This document is virtually identical to, and an obvious derivative of, the S1 K400 Socket Document, drafted by Yarborough while employed at S1.

41. As alleged in paragraph 35, Yarborough marked the S1 K400 Socket Document "S1 Internal, Not for use outside S1 Corporation except by written agreement." Yarborough violated this restriction, as well as his Confidentiality Acknowledgment and Disclaimer, by taking this document to Cardinal for use by Cardinal and Q2.

42. Given that the documentation for the S1 and Q2 interfaces are virtually identical, it is likely that the software for the interfaces will also be virtually identical.

43. S1 is unaware of any realtime processing capability by Cardinal prior to hiring Yarborough. Instead, S1 is only aware that Cardinal used batch processing prior to hiring Yarborough. In fact, S1 and Cardinal had a prior mutual customer, and if Cardinal offered a

realtime interface, Cardinal would have provided such an interface to S1 for use with such customer. Thus, on information and belief, Cardinal added realtime processing only after Yarborough joined Cardinal, bringing S1 proprietary and copyrighted materials with him, and by copying and using such materials.

44. Yarborough's copying of S1's interface documentation was for the purpose of and within the scope of his duties for Cardinal and Q2. Indeed, Cardinal and Q2 have used, marketed and distributed the S1 interfaces stolen and copied by Yarborough as proven by the fact that Yarborough sent the interface documentation back to S1 for purposes of serving a common customer.

45. Yarborough and Cardinal provided the S1 interface documentation to Q2. Upon information and belief, Q2 knew that such interfaces were the property of S1 and Q2 has made copies of such interfaces for Q2's customers, including former S1 customers.

46. The interfaces referenced herein are the only copied information known at this time, but it is unlikely that Yarborough's copying of S1 copyrighted material is limited to the S1 K400 Socket. Yarborough worked on other documents and interfaces at S1, including an "ISERIES/DEU/K400 Host Systems Interface Guide," which was registered with the United States Copyright Office on December 14, 2007, registration number TX 6-816-902. Therefore, on information and belief, it is likely that Yarborough, and perhaps other Former S1 Employees, also copied other S1 copyrighted and proprietary information.

47. All conditions precedent to bringing this lawsuit have been performed, waived or excused.

## COUNT I

### COPYRIGHT INFRINGEMENT

48. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49. S1 is the owner of registered copyrights for the S1 K400 Socket software, S1 K400 Socket Document and S1 K400 API Document (collectively "Copyrighted Information"). A copy of the receipt of filing these registrations is attached hereto as Exhibit A.

50. Defendants Q2 and Cardinal are distributing, marketing, and using documentation that is substantially similar to the Copyrighted Information.

51. Defendant Yarborough, as an agent of Q2 and employee of Cardinal, knowingly and intentionally copied the Copyrighted Information. Defendants Q2 and Cardinal have knowingly and intentionally used, marketed, and distributed the Copyrighted Information in furtherance of their business.

52. S1 did not give permission to or otherwise authorize Defendants to copy the Copyrighted Information.

53. Defendants Yarborough, Q2 and Cardinal engaged in such copying knowing that they did not have the legal right to do so and in disregard of S1's rights.

54. Defendants' acts constitute copyright infringement in violation of 17 U.S.C. §§ 106 and 501.

55. Pursuant to 17 U.S.C. § 502, S1 is entitled to permanent injunctive relief to prevent further damage to S1 and to prohibit Defendants Yarborough, Q2 and Cardinal from further violations of the Copyright Act.

56. Pursuant to 17 U.S.C. § 504, S1 is entitled to an award of damages resulting from Defendants' infringement of the Copyrighted Information.

57. Pursuant to 17 U.S.C. § 504, S1 also is entitled to disgorgement of all profits received by Defendants from use of the Copyrighted Information.

58. S1 also requests and is entitled to an order pursuant to 17 U.S.C. § 503 requiring the impounding and destruction of all copies made or used in violation of S1's copyrights and all masters by means of which such copies may be reproduced.

## COUNT II

### BREACH OF CONTRACT AGAINST YARBOROUGH

59. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

60. Defendant Yarborough signed a Confidentiality Acknowledgment and Disclaimer with S1 under which he agreed to maintain the confidentiality of S1 confidential and proprietary information.

61. Defendant Yarborough has breached his contract with S1.

62. As a direct and proximate result of Defendant Yarborough's breach of his contract, S1 has suffered and will continue to suffer immediate and irreparable harm in an amount to be ascertained at trial.

## COUNT III

### TORTIOUS INTERFERENCE WITH YARBOROUGH'S CONFIDENTIALITY OBLIGATIONS

63. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

64. Q2 and Cardinal, without privilege, tortiously, intentionally, and willfully interfered with S1's existing contractual relationship with Yarborough by obtaining, accessing, copying, using and disclosing the Copyrighted Information with knowledge that such conduct was in violation of Yarborough's confidentiality obligations to S1.

65. Defendants' tortious interference was willful, wanton and malicious, and with specific intent to harm S1.

66. Defendants' tortious interference has caused S1 to suffer damages in an amount not yet determined, for which S1 is entitled to recovery.

### COUNT IV

#### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS WITH CUSTOMERS

67. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

68. The Defendants, without privilege, tortiously, intentionally, and willfully interfered with S1's existing contractual relationships by soliciting S1's customers while they were still under contract with S1 through the Defendants' unlawful use and disclosure of the Copyrighted Information with knowledge that such Copyrighted Information was S1 property.

69. Defendants' tortious interference was willful, wanton and malicious, and with specific intent to harm S1.

70. Defendants' tortious interference has caused S1 to suffer damages in an amount not yet determined, for which S1 is entitled to recovery.

### COUNT V

#### COMMON LAW UNFAIR COMPETITION/PASSING OFF

71. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

72. By taking the actions described above to gain a competitive advantage, including the passing off of the S1 K400 Socket Document and the S1 K400 API Document as Cardinal and Q2 documents, Defendants Q2 and Cardinal are likely to deceive or confuse consumers and have engaged in unfair competition under the common law of Texas, and thereby damaged S1.

73. By engaging in such unfair competition, Defendants Q2 and Cardinal have caused, or are in imminent danger of causing, irreparable injury to S1, for which there is no adequate remedy at law.

74. Defendants' acts of unfair competition were willful, wanton and malicious, and with specific intent to harm S1.

## COUNT VI

### LANHAM ACT UNFAIR COMPETITION

75. S1 hereby incorporates the allegations contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

76. By engaging in the actions set forth herein, Defendants Yarborough, Q2 and Cardinal have made and are making false representations, false descriptions, and false designations of origin of their goods in violation of 15 U.S.C. § 1125(a) that are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion to and deception of members of the trade and public, and injury to S1's goodwill and reputation, for which S1 has no adequate remedy at law.

77. Defendants' conduct is causing, and is likely to cause, substantial injury to the public and to S1. S1 is entitled to injunctive relief and to recover Defendant Q2's and Cardinal's profits and S1's actual damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

78. Defendants' violation of the Lanham Act was willful, wanton and malicious, and with specific intent to harm S1.

WHEREFORE, S1 prays for the following relief:

a)  Issue a permanent injunction against Defendants Yarborough, Q2 and Cardinal, enjoining their infringement of S1's copyrights;

b)  Issue a permanent injunction against Defendants Yarborough, Q2 and Cardinal, enjoining their passing off of S1's property as Cardinal and/or Q2 property;

c)  Award to S1 and against Defendants, jointly and severally, actual damages in an amount to be determined at trial, and that such damages be trebled under 15 U.S.C. § 1117;

d)  Award to S1 and against Defendants, jointly and severally, Defendants' profits;

e)  Award to S1 and against Defendants, jointly and severally, punitive and/or exemplary damages;

f)  Award to S1 and against Defendants, jointly and severally, S1's reasonable attorneys' fees and expenses of litigation and all costs of this action; and

g)  That this Court grant S1 such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

S1 hereby demands a trial by jury on all issues properly triable to a jury.

Dated: January 10, 2008.

FISH & RICHARDSON P.C.

By: _____
Alan D Albright
Texas Bar Number: 00973650
111 Congress Avenue, Suite 810
Austin, TX 78701
(512) 472-5070
(512) 320-8935 (Facsimile)

Co-Counsel

MORRIS, MANNING & MARTIN, LLP
David A. Rabin, Esq.
Lawrence H. Kunin, Esq.
Kelly L. Whitehart, Esq.
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404) 233-7000
Fax: (404) 365-9532


Attorneys for Plaintiff S1, Inc.